UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**NORTHERN DIVISION AT COVINGTON**

```
ROBERT LANG,                    )
                                )
        Plaintiff,              )  Action No. 2:14-cv-00175-JMH
                                )
v.                              )
                                )  MEMORANDUM OPINION AND ORDER
CAROLYN W. COLVIN,              )
Acting Commissioner of          )
Social Security                 )
                                )
        Defendant.              )
```

**             **      **      **      **

This matter is before the Court on the parties' cross-Motions for Summary Judgment (DE 7, 9) on Plaintiff's appeal of the Commissioner's denial of her application for disability insurance benefits.[1]  The matter having been fully briefed by the parties is now ripe for this Court's review.

**I.**

In determining whether an individual is disabled, an Administrative Law Judge ("ALJ") uses a five step analysis:

> 1. An individual who is working and engaging in substantial gainful activity is not disabled, regardless of the claimant's medical condition.
>
> 2. An individual who is working but does not have a "severe" impairment which significantly limits his physical or mental ability to do basic work activities is not disabled.

---

[1]     These are not traditional Rule 56 motions for summary judgment. Rather, it is a procedural device by which the parties bring the administrative record before the Court.

3. If an individual is not working and has a
   severe impairment which "meets the duration
   requirement and is listed in appendix 1 or
   equal to a listed impairment(s)", then he
   is disabled regardless of other factors.

4. If a decision cannot be reached based on
   current work activity and medical facts
   alone, and the claimant has a severe
   impairment, then the Secretary reviews the
   claimant's residual functional capacity and
   the physical and mental demands of the
   claimant's previous work. If the claimant
   is able to continue to do this previous
   work, then he is not disabled.

5. If the claimant cannot do any work he did
   in the past because of a severe impairment,
   then the Secretary considers his residual
   functional capacity, age, education, and
   past work experience to see if he can do
   other work. If he cannot, the claimant is
   disabled.

*Preslar v. Sec'y of Health & Hum. Servs.*, 14 F.3d 1107, 1110 (6th

Cir. 1994)(citing 20 C.F.R. § 404.1520(1982)).

## II.

On June 21, 2011, Plaintiff filed applications for Disability

Insurance Benefits ("DIB") and Supplemental Security Income

("SSI"), alleging disability beginning June 30, 2009. His claim

was denied initially and after reconsideration.  He requested an

administrative hearing, which was held before Administrative Law

Judge ("ALJ") Christopher Daniels on May 1, 2013.  The ALJ issued

an unfavorable decision on July 8, 2013 (Tr. 11-28). After

Plaintiff asked the Appeals Council to review the ALJ's decision,

the Appeals Council declined Plaintiff's request for review, making the ALJ's July 2013 decision the final agency decision for purposes of judicial review. 20 C.F.R. §§ 404.981, 416.1481, 422.210(a).  This appeal followed and the case is ripe for review pursuant to 42 U.S.C. § 405(g).

### III.

Plaintiff was 40 years old at the time he allegedly became disabled on June 30, 2009. He has the equivalent of a high school education (GED) and past relevant work as a meat mixer operator, a packer, and a deckhand.  He does not dispute the ALJ's conclusion that he is severely impaired by degenerative disc disease of the neck and back, degenerative joint disease of the hips, and osteoarthritis of the knees bilaterally (Tr. 16).

He has received treatment from a number of providers.  The records of Dr. Mitchell Simons, his treating pain management specialist, reveal that Plaintiff reported ongoing lower back pain on July 6, 2009 (Tr. 387).  Dr. Simons prescribed Zanaflex and Celebrex, a muscle relaxer and a nonsteroidal anti-inflammatory drug, respectively, and recommended an epidural injection in the neck at C7-T1, where Plaintiff had a protruding disc (*Id.*).  When Plaintiff described significant pain on July 22, 2009, rated 6 to 7 on a 10 point scale, Dr. Simon described the pain as pain in the thoracic area in a T7-8 dermatome pattern (Tr. 385).  He recommended an epidural injection in that area and prescribed

3

Duragesic patches (*Id.*).  He also observed significant swelling of the left knee, where Plaintiff was also having issues, and recommended an injection (*Id.*).  Dr. Simons performed three thoracic epidural injections on July 30, 2009, and an injection in the knee on August 3, 2009 (Tr. 383-84).  Further treatment for continued pain in Plaintiff's shoulder, mid back, lower back, and both knees continued through August 2009, and Dr. Simons diagnosed Plaintiff with thoracic radiculitis, C7-T1 disc protrusion and radiculopathy, and bilateral knee pain (Tr. 382).  Additional thoracic injections reduced Plaintiff's pain level, but the pain returned prior to the next set of scheduled epidural injections on September 16, 2009 (Tr. 377, 380).  Eventually, on October 14, 2009, Dr. Simons reviewed a new MRI of the cervical spine which showed arthritic problems and discogenic changes at the C5-6 and C6-7 levels (Tr. 377).  He advised Plaintiff to start using Amrix in place of other muscle relaxers prescribed (*Id.*).  Plaintiff had further cervical epidural steroid injections on October 17, 2009, to little avail (Tr. 375-76), and had to delay further treatment due to upcoming knee surgery.  Following that surgery, after further complaints of pain in the lower back, Dr. Simons administered diagnostic lumbar blocks and additional injections in the lumbar area (Tr. 370-71) on January 6 and 15, 2010.  Plaintiff reported that the blocks helped but that he still had pain (Tr. 369) on January 27, 2010.  On February 24, 2010, Plaintiff stated

4

that additional injections helped (Tr. 366), and Dr. Simon noted lumbar facet joint tenderness, myofascial banding, and increased pain with motion in the cervical and lumbar spine.  Dr. Simon then performed a denervation procedure on March 4, 2010.

Meanwhile, Plaintiff's treating physician, Dr. Harold V. Markesbery, examined Plaintiff on July 20, 2009, where he observed tenderness in both knees with poor range of motion (Tr. 338) and diagnosed hypertension and knee osteoarthritis.  No significant changes were noted during a visit on August 10, 2009 (Tr. 332-35), but on September 9, 2009, Plaintiff complained to Dr. Markesbery of pain in his knees, hips, hands, and fingers (Tr. 329).  Dr. Markesbery observed poor knee flexion, tenderness in Plaintiff's shoulders, cervical spine tenderness, poor range of motion in the back, and tenderness of the lumbosacral spine and right knee (Tr. 330) and diagnosed Plaintiff with osteoarthritis and depression. He prescribed Fentanyl, Soma, Effexor, Kadian, and Zanaflex (Tr. 327-28).  Nonetheless, at Plaintiff's visit on November 23, 2009, he reported significant pain (Tr. 324), and Dr. Markesbery observed knee tenderness and poor range of motion, back tenderness with poor range of motion, and swelling (Tr. 325).  He diagnosed Plaintiff with hypertension and arthropathy (Tr. 326).  On December 21, 2009, Plaintiff presented with low back pain which began 3 years prior, which he described as severe and non-radiating and as aggravated by bending, coughing, exercising, lifting, prolonged

standing, sitting, straining, and walking.  He described how the pain would wake him from sleep and was worse in the morning.  He also reported that he had recently been doing a lot of walking, standing, working around the house, working in the yard, working out, moving furniture, jogging, participating in football and basketball, running cross country, and playing softball and baseball (Tr. 320).

Dr. Charlotte Harris, Plaintiff's treating orthopedic surgeon, began treating Plaintiff on October 23, 2009.  Plaintiff reported that he had been on and off work because of back, neck, and knee problems.  An examination revealed positive straight leg raising on the left, right knee motion from 10-120 degrees with positive McMurray's sign, and left knee motion from 5-120 degrees. X-rays showed grade 2-3 osteoarthritis in all compartments of both knees.  She prescribed Voltaren, a nonsteroidal anti-inflammatory drug used to treat pain, and requested an MRI of the right knee. That MRI, performed on October 29, 2009, revealed distortion of imaging due to hardware, tricompartmental osteoarthritis that was severe in the medial and lateral compartments, a questionable tear of the lateral meniscus, a questionable complete tear of the medial meniscus body, a suspect old partial tear of the proximal posterior cruciate ligament, a tear of the iliotibial band, and Baker's cyst (Tr. 313-14).  On November 18, 2009, Plaintiff underwent arthroscopic debridement of a small lateral meniscal tear and

chondroplasty of the medial and lateral femoral condyle and lateral tibial plateau with resection of thickened pathological plica and removal of a screw from a prior surgery (Tr. 317-18). He was ambulating with crutches two days post-surgery and was to try and wean off of the crutches and start exercises at home (Tr. 343). On December 22, 2009, Plaintiff reported "a lot" of pain and some catching in the knee (Tr. 342). His right knee initial extension lag was observed to be 20 degrees, with mild to moderate effusion and weakness of the quadriceps. Toradol was prescribed for pain, and physical therapy was recommended. On January 12, 2010, Plaintiff stated that therapy was helping, and his right knee lag was observed to be 5 degrees and his range of motion was 5-120 degrees (Tr. 341). Dr. Harris observed that he was no longer using narcotic pain relief, which made his head feel much clearer. She recommended that he consider vocational rehabilitation to transition to lighter work than the heavy labor he had done in the cold environment of the meat packing facility.

On August 30, 2010, Plaintiff was evaluated at Denham Medical Clinic (Tr. 449), where he reported shoulder and knee pain. His symptoms were unchanged at a follow-up on September 23, 2010 (Tr. 448). When an examination revealed decreased motion in the right shoulder with crepitus, Lang was prescribed Toradol and Celebrex. On May 23, 2011, Dr. William Denham, a family medicine physician, and Cynthia Schaefer, APRN, reported treating Plaintiff for

degenerative arthritis in both knees with a history of multiple surgeries, hypertension, depression, and chronic back pain (Tr. 417). Both felt that Plaintiff could not return to work because of his inability to sit for more than 2 hours or to stand/walk for more than 1 hour and that he was unable to perform repetitive movements such as pushing, pulling, bending, and kneeling. They advised that Plaintiff required double knee replacements but that it was recommended that he wait until he was in his fifties to prevent additional intervention later in life. When Plaintiff was seen for knee pain and depression on August 25, 2011, Ms. Schaefer opined that he was unable to return to work because he could not sit or stand for long periods of time (Tr. 447). No improvement as noted at visits on September 19, 2011, or December 12, 2011 (Tr. 444-45). On January 24, 2013, Plaintiff reported bilateral knee pain that was worse on the right and right sciatic nerve pain (Tr. 486). Bilateral knee pain was observed, and x-rays taken on January 25, 2013, revealed advanced tricompartmental arthritic changes in both knees despite prior surgery (Tr. 489).

Nurse Schaefer completed a Multiple Impairment Questionnaire on July 25, 2011, which was co-signed by Dr. Denham (Tr. 419-27). Plaintiff was diagnosed with left C7-T1 disc protrusion with cervical radiculopathy, degenerative arthritis in both knees, two torn menisci, chronic hypertension, and depression (Tr. 419). Clinical findings included pain and tenderness in both knees, upper

8

and lower back pain, and neck pain and tenderness.  MRIs of both knees, the cervical spine and back, as well as x-rays were offered to support the diagnoses (Tr. 420).  The Questionnaire reported that Plaintiff's primary symptoms were back and knee pain, tingling and numbness in his neck and spine, fatigue, and lack of movement with pain rated at moderately severe (from 7 to 8 on a 10 point scale) and fatigue as moderate (6 on a 10 point scale) (Tr. 420-21).  They opined that Plaintiff is able to sit 2 hours total and stand/walk less than 1 hour in an 8 hour workday; can occasionally lift and carry 5 pounds; has significant limitations performing repetitive reaching, handling, fingering, and lifting due to "terrible back and knee pain;" and is precluded from grasping, turning, and twisting objects (Tr. 421-23).  They also opined that his pain, fatigue, and other symptoms were constantly severe enough to interfere with attention and concentration (Tr. 424).

Dr. Denham completed a second Multiple Impairment Questionnaire on July 23, 2012 (Tr. 462-69) in which he reported seeing Plaintiff once a month.  He again opined that Plaintiff suffered from left C7-T1 disc protrusion with cervical radiculopathy, degenerative arthritis in both knees, two torn menisci, chronic hypertension, and depression (Tr. 462-63), all diagnosed as a result of MRIs of both knees and the cervical spine and back, x-rays of the knees and back, and blood pressure monitoring, as well as Plaintiff's demonstrated symptoms. Which he

felt were reasonably consistent with the diagnosed physical and emotional impairments (Tr. 463).[2] He opined that Plaintiff must get up and move around every half hour for fifteen minutes before he can sit again and that he must not stand or walk continuously in a work setting. He further opined that Plaintiff could never lift or carry any weight; has significant limitations in repetitive reaching, handling, fingering, and lifting; has marked limitations with grasping, turning, and twisting objects in both the right and left upper extremities; has moderate limitations in the right and left upper extremities with respect to using the fingers or hands for fine manipulations; and had marked limitations for using arms for reaching (Tr. 465-66). He opined that Plaintiff would have only "bad days" due to his impairments and would need to avoid wetness, noise, temperature extremes, heights, pushing, pulling, kneeling, bending, and stooping and would be impacted by psychological and vision limitations (Tr. 468).

On February 8, 2013, Plaintiff was evaluated by Dr. Karl Kumler, an orthopedic surgeon, who observed bilateral knee pain and back pain with a history of multiple surgeries (Tr. 481). He observed that Plaintiff had difficulty walking on his toes and heels (Tr. 482), and an examination revealed flexion contractures of both knees, mild pain throughout motion, mild positive straight

---

[2] Dr. Denham added a diagnosis of bipolar disorder in the second assessment, but neither Plaintiff nor the Commissioner party has identified this as relevant to the issues on appeal.

leg raising test bilaterally, mild pain with right hip motion, mild midline tenderness of the lumbar spine, poor flexion of the spine, and minimal motion in other directions (Tr. 482-83). Dr. Kumler reviewed x-rays and reported evidence of early facet arthritis in the spine, diffusely (Tr. 483). After diagnosing Plaintiff with leg weakness, lumbar radiculitis, and knee osteoarthritis, he prescribed a Medrol Dosepak, an anti-inflammatory medication, and recommended therapy (Tr. 484).

Plaintiff was examined by Dr. Naushad Haziq on October 19, 2011, at the request of the Social Security Administration. Dr. Haziq observed that Plaintiff had a broad-based, slow, cautious, and antalgic gait; that he presented without assistive devices or ambulatory aids; that he was able to stand unassisted, rise from a seat, and step up and down from the examination table; and that he appeared comfortable while seated and supine (Tr. 435). He also observed pain and tenderness in the neck; weakness of Plaintiff's left grip compared to the right; pain, tenderness, and swelling of the knees; crepitus of the left knee with mildly limited motion; and moderate to severe limited motion in the right knee (Tr. 435-36). He also observed pain and tenderness in Plaintiff's lumbar spine with flexion-extension to 70 degrees and both left and right lateral flexion to 20 degrees; straight leg raising to 70 degrees bilaterally; knee flexion-extension to 60 degrees on the right and 100 degrees on the left; difficulty with

11

walking on heels and toes and with tandem gait; and an inability to squat. He diagnosed Plaintiff with moderate to severe arthritis of the knees, neck and back pain, hypertension, and obesity (Tr. 437).

Dr. Diosdado Irlandez, a consulting, non-examining agency physician, opined that Plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds; stand or walk about 6 hours in a normal workday, sit with normal breaks for 6 hours in a normal workday, push or pull hand or foot controls for an unlimited amount of time; occasionally climb ramps and stairs, ladders, ropes, and scaffolds; perform unlimited balancing, stoop or bend at the waist occasionally, kneel occasionally, crouch occasionally, an crawl occasionally; and avoid concentrated exposure to vibrations. He based his opinion on the limitations observed during Dr. Haziq's examination as well as the impressions obtained from diagnostic testing, all of which reasonably supported Plaintiff's reported symptoms but not the severity and intensity to which Plaintiff testified (Tr. 83-85). Looking at the same records, Dr. James Ramsey, another consulting, non-examining agency physician, opined that Plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds; stand or walk about 4 hours in a normal workday, sit with normal breaks for 6 hours in a normal workday, push or pull hand controls for an unlimited amount of time but only occasionally use

12

foot controls due to degenerative joint disease of the right knee; frequently climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally balance, kneel,, stoop or bend at the waist, kneel, crouch or bend at the knees, and crawl; and avoid concentrated exposure to vibrations and hazards such as machinery or heights (Tr. 102-04).

Plaintiff testified that he is unable to work due to constant pain in his back and knees (Tr. 37-38), rated at an 8 on a 10 point scale.  Plaintiff estimated that he can walk half a block, stand for 10 to 15 minutes, sit for "maybe" an hour, has difficulty lifting 20 pounds, and drops objects from his hands about once a day (Tr. 42-43).  He testified that his pain in his knees is a constant stabbing pain and that nothing in particular causes his knee pain to be worse during the course of a day (Tr. 39-40).  With respect to his pain in his hips and back, he testified that it becomes worse if he "turn[s] too quick" (Tr. 39).  He testified that he lives with his girlfriend and cooks meals and does laundry together with her, which does not require carrying the laundry very far since the washer and drier on are on site in their residence, but that she does the grocery shopping and dishes (Tr. 34, 45).  During the day he watches television on the couch or in bed for most of the day, which gives him relief from his pain symptoms and, while he used to do other things, he would "just rather stay in bed" (Tr. 46-47).  He can vacuum for two minutes

13

(Tr. 47) and is successful because he lives in a very small residence. He uses ice and takes hot showers to help with his pain and finds that over-the-counter medications such as Advil are "somewhat" effective in controlling his pain (Tr. 39). He drove himself about fifty miles to the hearing but had to stop once, get out of the vehicle, and stretch (Tr. 44). He testified that he used to play softball and fish, as well as participate in other activities, but that he no longer does so and that his hobbies have been limited for about three years (Tr. 44-45).

The ALJ concluded that, notwithstanding Plaintiff's severe impairments and his treating physician's estimates of his ability to do work, Plaintiff retained the residual functional capacity ("RFC") to lift or carry up to 20 pounds occasionally and 10 pounds frequently, to stand and/or walk two hours in an eight hour period and sit for up to six hours in an eight hour period; occasionally use his lower extremities to operate foot controls; and occasionally balance, stoop, kneel, crouch, and crawl (Tr. 17). The ALJ further concluded that Plaintiff is unable to climb ladders, ropes, scaffolds, ramps, and stairs and needs to avoid concentrated exposure to vibrations and hazards (*Id.*). In reaching that conclusion, the ALJ determined that Plaintiff's medically determinable impairments could be reasonably expected to cause the symptoms alleged by Plaintiff but that his statements concerning the intensity, persistence and limiting effects of the symptoms

14

were not entirely credible (Tr. 20).   He noted particularly the use of over-the-counter medications and ice which were effective to alleviate some of Plaintiff's pain, the lack of convincing details concerning factors which precipitated pain and other disabling symptoms, and the fact that Plaintiff's ability to do some work around his home suggested a greater level of function that Plaintiff testified to being able to do.  He gave little weight to the assessments of Plaintiff's ability to do work by Dr. Denham or the observations of Ms. Schaefer because the limitations proposed were similarly undermined by the evidence of record, as set forth above and which also included post-surgical observations by other physicians that the claimant was "doing pretty well" but should pursue lighter work in the face of his knee issues.

When the ALJ posed a hypothetical based on that RFC to the vocational expert ("VE") at the administrative hearing, she testified that such an individual could not perform Plaintiff's past work but could work at the sedentary exertional level, including jobs as factory worker, hand packer, inspector/sorter, of which their existed an appreciable amount in the regional and national economy (Tr. 50-51). Ultimately, based upon the testimony of the VE, the ALJ concluded that, while Plaintiff could no longer perform his past work, there were jobs that existed in significant numbers in the national economy that he could perform with his

age, education, work experience, and RFC, and that Plaintiff was not disabled (Tr. 22-23).

## IV.

When reviewing a decision made by the ALJ, the Court may not "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). "The ALJ's findings are conclusive as long as they are supported by substantial evidence." 42 U.S.C. § 405(g); *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) (citations omitted). Substantial evidence "means such relevant evidence as a reasonable mind might accept." *Foster*, 279 F.3d at 353.

## V.

Plaintiff challenges the ALJ's decision that he retained the ability to do sedentary work for failing to properly weigh the medical evidence of record and for failing to properly evaluate his credibility. Specifically, he argues that the ALJ erred when he decided to give "little weight" to treating physician Dr. Denham's opinion that Plaintiff would have to lie down or recline four to five hours a day because it was "wholly unsupported by the record" [AR 21] but did not identify any discrepancies between Dr. Denham's opinions, the underlying medical evidence, or Plaintiff's testimony concerning his that he spent most of his days either on the couch or in bed (Tr. 46). Plaintiff points out that Dr. Denham

16

based his assessment of Plaintiff on clinical and diagnostic
evidence, which the ALJ accepted in determining that Plaintiff had
severe impairments due to degenerative disc and joint disease, as
well as osteoarthritis in his knees, including Dr. Denham's
observations and Plaintiff's complaints of pain and tenderness in
both knees, his observations and Plaintiff's complaints of upper
and lower back pain, his observations and Plaintiff's complaints
of neck pain and tenderness, MRIs of both knees, the cervical
spine, and back, and x-rays [AR 419-20, 462-63]. He further argues
that the ALJ cited no evidence to support a conclusion that Dr.
Denham's assessment of Plaintiff's ability to do work was
inconsistent with the treatment records documenting pain,
tenderness, and limited motion in the knees (Tr. 325, 330, 338,
341, 342, 345, 382, 385, 435-436, 482, and 486) as well as
tenderness in the neck and back with limited motion (Tr. 325, 330,
366, 369, 382, 385, 435-436, and 482-483).

Plaintiff's own brief provides the answer, however, for he
argues as well that the ALJ erred when he concluded that
Plaintiff's testimony concerning the nature and severity of his
knee and back pain were undermined by the fact that he took over-
the-counter medications such as Advil and Ibuprofen to relieve his
pain instead of stronger prescription medications. He also argues
that the ALJ erred in his evaluations of Plaintiff's activities of
daily living – vacuuming, taking out the trash, cooking, and doing

17

laundry, which Plaintiff describes as much less onerous than the ALJ believed them to be – and the ALJ's conclusion that they were inconsistent with Plaintiff's claims and Dr. Denham's opinion that Plaintiff can do no work.

It is not inappropriate for an ALJ to consider the type of treatment, including the type and relative strength of pain relief medications used by a claimant, or the claimant's ability to perform other tasks outside of work, in evaluating a claimant's credibility or the credit given to the treating physician's opinion of the claimant's ability to do work. *See* 20 C.F.R. § 404.1529(c)(3)(i), (iv)-(v) (stating that an ALJ must consider a claimant's activities and the type of treatment); 20 C.F.R. § 404.1529(c)(4) (stating that an ALJ must consider whether there are conflicts between a claimant's statements and the rest of the evidence); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) ("The ALJ could properly determine that her subjective complaints were not credible in light of her ability to perform other tasks."). This uncontroverted evidence exists and, whether or not this Court would reach the same conclusion from it as the ALJ, the Court must uphold the ALJ's decision premised upon it.[3]

---

[3] The Court is not persuaded to conclude otherwise by Plaintiff's reference to *Scandura v. Astrue*, No. 07-cv-5098, 2009 WL 648611 *9 (E.D.N.Y. March 10, 2009), or *Geiger v. Astrue*, No. 10cv5765-BHS-JRC, 2011 WL 5282712 *11 (W.D. Wash. Oct. 5, 2011), the first of which addresses the situation where an ALJ overstates a treating physician's opinion regarding limitations only to reject it and the second of which addresses a situation where an ALJ relied almost exclusively on the claimant's ability to sit comfortably in a hearing when

*See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) (affording great deference to ALJ's determination of credibility of claimant's subjective complaints of pain).

Further, the ALJ was not bound by Dr. Denham's opinion concerning Plaintiff's ability to do work, even if it was supported by sufficient clinical findings, if it is inconsistent with other evidence of record – which would include Dr. Haziq's observations of Plaintiff's ability to move and ambulate in this instance. *See* 20 C.F.R. § 404.1527(c)(4), stating that an ALJ must consider whether opinion is consistent with the record as a whole); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 652 (6th Cir. 2006). Finally, Dr. Denham authored two opinions approximately one year apart (*compare* TR. 419-27 (July 2011 opinion indicating that Plaintiff could limit up to five pounds and would have good and bad days and that these limitations applied since October 2008) *with* (Tr. 462-69 (August 2011 opinion indicating that Plaintiff could never lift any weight and would have only bad days and that these limitations applied since March 2002). A reasonable person could conclude that Plaintiff was not as limited in his ability to do work as he claimed after looking at the conflict between Dr. Denham's assessments, without any obvious changes with respect to Plaintiff's condition; the fact that Dr. Denham's opinion that

---

substantial evidence supported claimant's statements that she could not do so in the course of an eight-hour workday.

Plaintiff could not perform sedentary or light work conflicts with evidence of the effectiveness of Plaintiff's treatment and the observations of the treating orthopedic specialists that he should consider seeking lighter work than he had done before; Plaintiff's use of over-the-counter medications which were somewhat effective at controlling his pain; Dr. Haziq's observations of Plaintiff's ability to move and his assessment of his level of discomfort; and Plaintiff's reported activities in the home and community. Even if the Court would reach a different conclusion concerning Plaintiff's credibility on these facts, the Court cannot fault the ALJ for reaching the conclusion that he did and concluding that Plaintiffs' claim that he could not perform even a range of sedentary work was incredible.

## VI.

Ultimately, the Court concludes that the Commissioner's decision denying benefits is supported by substantial evidence because he developed an RFC which reflected the evidence of record and based his opinion on the testimony of VE which was responsive to a hypothetical question which reflected that RFC. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004) ("[T]he Commissioner may rely on the testimony of a vocational expert to find that the claimant possesses the capacity to perform other substantial gainful activity that exists in the national economy."). The Court affirms the decision.

20

Accordingly, for all of the reasons set forth above, **IT IS ORDERED:**

1)    that Plaintiff's Motion for Summary Judgment (DE 7) is **DENIED** and

2)    that Defendant's Motion for Summary Judgment (DE 9) is **GRANTED.**

This the 4th day of March, 2016.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge